May it please the court. My name is Abraham Goldman. I represent the plaintiff and appellant Susan Schofield. As a preliminary matter, I'd like to reserve five minutes for rebuttal. Also, I am bilaterally deaf. I have two cochlear implants, which is why I have these headsets. I was able to hear everything very well through the microphone system on the first argument. We had a test run, so I think things should be okay. If my apparatus is giving off feedback or some type of unusual interference with the sound system, or if I'm not speaking loud enough for the court to hear me or for opposing counsel, please let me know because I don't have enough. I don't know quite what my voice is doing. I think the sound level is fine here, and these devices seem to usually work quite well with our sound system. Great. And so the question will be to make sure that you can hear me, because so far I've been able to hear the court very well and I was able to hear counsel up at the podium. So thank you very much for your patience on that. My client, Susan Schofield, was a career health care worker who gave 25 years of her life to being someone who put people to sleep, kept them alive, and brought them back to life from anesthesia. And unfortunately, she developed a series of diseases that did not allow her to continue with that critical life-saving job. She had paid out of after-tax dollars into her disability program so that she could have disability when she needed it. It was promised to her in the summary plan description that this is something that Kaiser guarantees its employees and she relied on that. When it came to submitting the application when she was disabled, the fiduciary in this case and the Supreme Court in this court has emphasized now for at least half a dozen times that the real issue here is the person who's acting as the administrator acting as a fiduciary higher than marketplace standards in the best interests of the beneficiary. This is whether there's discretion or not. A fiduciary must always act in the best interests of the person that they're responsible for, the person that they hold trust for, the person that they make the decisions for. This has been recently emphasized in the Supreme Court's recent decision in MetLife v. Glenn. It was emphasized two years ago by this court and Bank and Abate. It was recently emphasized again by this court and Safan. And what we have here is a case where a fiduciary simply has no discretion to not follow the law. Well, the area I would like you to focus on, I think I understand Abate and I understand Glenn and all of that. Your client, they changed why they denied benefits from her, right? They went through more than one process. And the question that I have here, and it was discussed on some level, but the April 18th letter of 2002 letter denying her appeal says, Dr. Smith concluded that the medical record supported and stated diagnosis of fibromyalgia as well as depression. Further, he indicated that Ms. Schofield would not be able to do her prior job as a nurse anesthetist, but that, and what's interesting here, the medical records, the the is capitalized. It looks to me like they cut and paste it from the letter that they used before where they denied benefits. The medical records did not document objective findings, pathology or impairments that would preclude her from doing more sedentary nursing duties that fall within the category of her own occupation, such as administrative quality review or utilization review. So first they just said she could still be a nurse anesthetist, right? Correct. Then they said, well, and this isn't what's clear, then she can't be a nurse anesthetist, but she can work within her own occupation. But then there's the issue about whether the 80 percent rule applies, and there seems to be some issue here. You know, why was she denied benefits? If she was denied because she can't be a nurse anesthetist, do they then have to do the 80 percent rule analysis, and did they do that? And if they didn't do that, how does that factor into our review of this? Your Honor, it's really amazingly simple, this case. The standard for disability is that from disease, any disease, any combination of diseases, and we have at least three combination diseases here that all the doctors agreed upon, my client's doctor and the reviewing doctor for MetLife, fibromyalgia, chronic fatigue, and degenerative back. The first decision, which was made on only nine pages of illegible handwritten notes that came after the diagnosis, said that these nine pages of paper don't show that she's disabled. Well, those nine pages of paper really wouldn't show anybody much of anything. These were from whom? Who wrote these nine pages? The nine pages were post-disability handwritten progress notes by Dr. Heikes, my client's doctor. That's the doctor upon whom you're arresting your case primarily, right? Well, actually, I arrest my case both on Dr. Heikes, definitely. He's the hands-on treating physician that has treated Ms. Coffield for years. He's the one who referred her to the three specialists at Kaiser. And also Dr. Smith, MetLife's own doctor. He reverses his initial decision, which was in support of the original denial. There's not enough illness here to say that she can't work as a CRNA. But he only has these nine pages of paper. And later when he has the full record, the full record of Dr. Heikes' tests and all the documents and the further review by the rheumatologist, Dr. Lamby, he says, I find that she cannot work as a CRNA. And the appeal letter that Judge Callahan just referred to confirms that. Everyone, every doctor, every medical report, and even the MetLife review letter affirms that Susan Scofield can no longer safely work as a CRNA. Did Dr. Heikes once or maybe twice say that she could return to work? Well, that was during the period of time that she was on state short-term disability. And he was writing notes saying that she could go back to work, she could go back to work. But as of December of 2001, he definitively stated and repeated that and never varied after December 2001 that Ms. Scofield could not go back to work. That was a little bit troubling to me, is that it really doesn't matter what her Social Security status is. He basically makes a statement in the fall of 2001 on two occasions that she can report back to work in January, on January 2nd. And he even does that as late as, I think, late November of 2001. And then it seems with no rationale stated, he said, oh, she's totally disabled. So when you're looking at the decision of MetLife on an abuse of discretion standard, why would it be an abuse to discount the late determination where it isn't provided with any rationale or explanation or change of situation? Well, I think there's two things. One is because up to that point, Ms. Scofield was on this plan that MetLife and Kaiser had that she would be paid not through the long-term disability, but as a combination of salary replacement and state short-term disability. And that state short-term disability required those state forms to be filled out that she could return to work. But I guess my question is why did MetLife deny her benefits because she can't be, did MetLife ultimately conclude that she could not be a nurse anesthetist? Absolutely, in that letter that Your Honor just read. Okay. So we're reviewing the last letter for abuse of discretion, correct? Or what are we reviewing for that? That's the ---- Well, that's what's so difficult in terms of the way that MetLife handled this matter. The initial determination for which the appeal is supposed to, the internal appeal is supposed to provide the relief, made the decision that Susan Scofield could continue to work as a nurse anesthetist. That was the issue. That was the issue that was appealed internally. That's really the only issue that they could address. Dr. Smith, after reviewing the entire record, and also Dr. Heike's February 20th letter, which reviewed his entire record, and every note by Dr. Heike's from December onward said that Ms. Scofield could no longer work as a CRNA because she did not have the focus, the energy, the ability to be able to have a patient who she's basically put to sleep be in her hands and have her wake them up. Was that based on examination of her or treatment of her subsequent to his earlier statements that she could return to work? It started in October of 2000 when Dr. Heike's put Ms. Scofield on 80 percent time. That did not work. Then in March, Kaiser, who is the employer, Ms. Scofield's supervisor's statement said that Kaiser put Ms. Scofield on disability. Kaiser made the decision that she could not work in March of 2001. Then there was a six-month waiting period to be able to apply for the long-term disability. And, yes, there are some inconsistencies in Dr. Heike's notes. My question was whether he treated her or examined her after those earlier statements that she could return to work. He did continue to treat her. He did continue to see her. But his notes said she has been like this for several years. Dr. Lamby said the same thing. That was the rheumatologist that my client was referred to. She's been like this for several years. There's not going to be any improvement in her condition. And Dr. Heike's and both Drs. Smith, I mean, we have both sides agreeing, the doctors on both sides agree, that this lady cannot handle the life-saving work of being a certified nurse anesthetist. And MetLife's final appeal letter agrees. MetLife's appeal letter in April says it reverses the initial determination. But then they come. What is the other thing that was potentially a little confusing is the use of this term own occupation. And MetLife says, you know, in addition to being a nurse anesthetist, that you could have sedentary nursing duties that fall within own occupation, such as administrative quality review or utilization review. What is your position on that? Your Honor, Judge McKeown? McKeown. Is that pronounced correctly? McKeown. McKeown. McKeown. Judge McKeown. Our position on that is twofold. One is that under the exact language of the policy, it's the employer that defines what your own occupation is. That's precisely who decides, and that was Kaiser. Kaiser's supervisor statement said, this lady, my client, is a certified nurse anesthetist. Everyone agreed she could not work as a certified nurse anesthetist. That was her own occupation. Then what they did was they took, you know, these little boxes from the supervisor statement, and they cut and pasted a few. She could sit a little bit, she could walk a little bit, she could do this, she could do that, and, therefore, she could do some sedentary work that fell within this sort of schematic of what a certified nurse anesthetist does. But the important thing is they left out the key things that the supervisor said. She has to be able to focus and concentrate 33% to 66% of the time. She has to be able to handle stress. Well, I'd like someone to concentrate 100% of the time if I'm under anesthesia. Absolutely, Your Honor. But. No room for error. So may I reserve your last five minutes? Yes. Thank you very much. And thank you for your patience in my hearing. Good morning, Your Honors. I'm Rebecca Hall. I represent the appellees in this case. I have to admit this is one of those cases that, without sounding overly flippant, sometimes makes me feel like I fell down the rabbit hole. Say that again. I'm sorry. I said this case sometimes makes me feel like I fell down the rabbit hole along with Alice because a great many things seem to have become backwards once you get into the file. In particular, I wanted to share with the Court that last night, when I was again reading the administrative record, which as you all know is quite extensive, it's docket number 18, I finally had an ah-ha moment as to where some of the massive confusion came from. What happened here was that Ms. Schofield's supervisor, the chief anesthetist, had in fact provided a job description at the request of MetLife. This is a standard thing when an employee goes out on disability. Their supervisor is asked to describe what are their job functions, what do they actually do. And he had described it in a way that made it sound relatively low stress, low key. I mean, not stress in the sense of mental stress, but certainly in terms of physical ability, which in fact has been the issue all along in this case. It hasn't been a question of mental ability beyond what was described as mild depression that was controlled with Prozac. But I did have an ah-ha moment when I finally figured out where this business about the CRNA job supposedly involving lifting patients and having to lift 100 pounds came from. It came from the appeal letter that the attorney submitted, not Mr. Goldman, but prior counsel, in March of 2002. That is the first place it appears. That letter makes the representation that part of her job at Kaiser was having to lift up to 100 pounds at a time. And she basically said, this woman can't do this. How could you possibly find that she's not disabled? Now, later in the same letter, there is, at the very end of the letter, there is a quotation from the Department of Labor's Dictionary of Occupational Titles, which describes a anesthetist position as one. We've had problems in my chambers saying that, too. Yes, we don't want to say it over and over. It won't work. It's a time twister. Exactly. But there's, in that definition, there is a provision that says this is a light duty job. Well, in my mind, lifting 100 pounds is not a light duty job. And it talks in that particular definition about the lifting requirements that would be expected of this position are 10 pounds most of the time and sometimes up to 20. Well, again, that's a far cry from 100. So it occurred to me that what happened here was it was a simple typographical error that got this 100-pound nonsense in there, which then gets picked up in Dr. Smith's report, his second report, because when they send him the additional medical records, they also sent the attorney's letter. And he cites that in his report. He says he read the attorney's letter and the attorney's letter described the job that his or her client did as being one that required to lift 100 pounds and so on and so forth. And he goes on and says, I don't think she can do that. Now, he obviously, or at least it's obvious to me, he took at face value what the attorney's letter said as being a good-faith description of what the attorney's client actually had been doing. Kennedy. Did he change his mind later, or is that his final conclusion? This was in his final letter. But what he said was, basically, taking that as her job description, she couldn't do that. But then he goes on to say, which Appellant's counsel continually forgets to mention, but she can do the job that was described earlier, which is, in fact, the job as described by the chief anesthetist. That's what he said. So Mr. Coleman suggested that his case could rise and fall on Mr. or Dr. Smith's conclusions. Would you say that? Dr. Smith's very specific conclusion was that she could do the job as described by her supervisor. But ultimately, ultimately, MetLife said she could do the job of a nurse anesthetist. But then they changed that position and said that she couldn't do that job, but she could do other jobs in her own occupation. Okay. I'm sorry. So are we reviewing MetLife's last decision? Or, I mean, you're saying now you've decided how they finally got here, and they were erroneous in getting here. But we can't, don't we have to review what MetLife finally did? Absolutely. But what MetLife said was, and you just alluded to it, Your Honor, that she could do things falling within her own occupation, while her own occupation is what her supervisor described her job as being. Well, I guess that is. How specific was that, when they asked the supervisor what is this job, what was the description? The job description is found at the administrative record at 319-20. See, what I can't tell. Wait. I'm sorry. Go ahead and tell us what that says. Oh, I'm sorry. No, I'm sorry. That's Dr. Smith's report. The job description is at 76. Thank you. Thank you. But, I mean, the where this went wrong was. Answer the question. What is the job description? Okay. The job description is actually. I mean, we can talk up here all we want, but. Right. I understand. The job description. The question is what can this lady even do? Well, actually, I'm sorry, counsel, it's not 76. Let me just look very quickly here. I can find it. It's at the administrative record at 340. It's a one-page form, supervisor's statement. And it goes through and it gives her title, CRNA. And it goes through and lists the various actual functions that she has to be able to do in her job, including how long she has to be able to sit and stand, walk, bend, twist, et cetera, et cetera. So this is what was provided to Dr. Smith the first time around. The first time around. And what does it say about lifting? What it says about lifting is lifting and carrying. 34 to 66 percent of the time, up to 10 pounds, anything above that, every single box is never 0 percent of the time. So it's completely different from what the attorney said in the letter. But my aha moment was it was a typo. She meant to say 10 pounds. It went totally off the rails because she said 100, because she accidentally got an extra 0 in there. I think that's the only logical explanation, because otherwise there's a complete conflict between the beginning of her letter and the end. But she was lifting patients, right? No, she wasn't. No, but the letter that says 100 pounds, does it say lifting patients? I mean, patients can't weigh 10 pounds. Well, unless she's a pediatric only, yes. I agree. That's why I say it's a typo. So that's how we don't know whether it's a typo or not. Well, no. The attorney's letter doesn't say lifting patients. It just says has to lift up to 100 pounds, I believe. Let me just look quickly. That is Admin 137. It just says this work includes walking and standing for most of the day, semicolon, lifting up to over 100 pounds, semicolon, crawling and bending. And it goes on to say other things. It doesn't say lifting patients. It just says lifting. And I think it was a typo, because otherwise it makes no sense when you get to the end of the letter and the attorney is saying, and the Dictionary of Occupational Titles supports this, and this is a light job, and light means that the person must be able to lift 20 pounds maximum and 10 pounds frequently. Otherwise, the two parts of her letter don't make sense. Well, I guess, but that makes it hard for us. I'm wondering why we shouldn't vacate and remand on the ground that I can't tell did whether MetLife determined that Schofield could do her job as a nurse anesthetist or only that she could do other nursing jobs, and if it would be the latter one, then whether those nursing jobs would pay her 80 percent of her prior income. Because I know that MetLife argues that we don't have to do that second analysis, but if own occupation means, does it mean nurse anesthetist? Because it seems that the last letter that I pointed out from Dr. Smith, it looks like they cut and pasted in that from the first letter. But the problem is what they cut and paste is the conclusion isn't the same in the first letter as it was in the second letter. And MetLife argues that the 80 percent clause does not come into play because it determined that Schofield was capable of working in the same position at the KFH facility in Sacramento at the same salary level that she held before she ceased working. But that might be a fair statement of MetLife's initial denial of benefits, but it seems to overlook the critical differences between the former denial from Dr. Smith and then his latest denial. That's why I understand the Court's point, but I think that what's happened here is because Dr. Smith was reading this letter that asserted that she had to be able to lift 100 pounds, which she clearly couldn't do, he concluded if that is the job she had and that is a job of nurse anesthetist, then she can't do it. But, in fact, that was not the job she had. That is not the job of a nurse anesthetist. But you think it's a typo now. We don't really know whether a typo. We only know what all of them say. We know what the first letter says. We know what the second letter says. And it's not clear to me what her own occupation is. Are they saying they first said she couldn't be a nurse, that she could do her, she could be a nurse anesthetist, but then they're saying she can't be a nurse anesthetist, but she can work in her own occupation. If that means as a nurse anesthetist or does that mean as a nurse, if it just means as a nurse, then you have to say can she do 80 percent. The first letter didn't actually come to the conclusion of what she could or couldn't do, as I read it. As I read it, it said basically you haven't supported that you're functionally unable to do your original occupation, which would be the job described by her supervisor, the chief anesthetist. See, I'm completely on board with your argument in terms of where you can, you know, when we review for an abuse of discretion, why they might give more weight to one than the other. But when you don't really even know what, I'm struggling with this own occupation and whether if they didn't do something that they had to do to reach their legal analysis, I don't know why an argument can't be made that it should just be remanded and they need to determine those things. Well, perhaps they need to clarify it. But as I said, I think what happened here was because Dr. Smith was confused by the attorney's letter, it just snowballed from there. If you want to benchmark what's her own occupation, is the only place you look at page 340? That's the description of what she did. The question is, could she no longer do that when she stopped working? Well, now that's, you know, we're talking past each other because that's what she did before. That was her job description. Then there's an own occupation, which can be not the precise job, but is something within the penumbra of that job. Right. Not a different job. So what document defines own occupation other than the last rejection letter, which talks about she could be a reviewer? I would submit that own occupation means the list of functions that her supervisor And it could be supplemented, actually, by the definition in the Dictionary of Occupational Titles that her attorney submitted, which is also consistent with her abilities, which is found at page, let me see, it's Admin 145. Administers local inhalation intravenous, et cetera, anesthetics, and so on and so forth, and goes on and talks about what the person does and describes it as a light-duty position, occasionally lifting up to 20 pounds and most of the time only 10. That is her occupation. That's the more generic description of her occupation. But doesn't the last letter say she can't be a CRNA? What it says so that Well, then how could CRNA be the same thing as her own occupation? Because where that comes from is that Dr. Smith picked up the attorney's description of what her job supposedly was and says she can't do that. He reports back So we know that because you're channeling Dr. Smith? No, because that's the only place this could come from. In fact, he references specifically, he references the attorney's letter as describing her job as being these things. Let me just point you to that particular He goes through and talks about all the different records that he now has received when they finally were submitted, summarizes the different points, and then says Minna Williams, Paran attorney, close friend. This is at Admin 128. She sent a letter in for appeal on 325.02. She stated that her, meaning the participant's work as a nurse anesthetist at Kaiser, at Kaiser, involved lifting up to over 100 pounds, crawling, bending, et cetera, et cetera. And he's basically very slightly paraphrasing the attorney's actual letter. That's not her job. Let me ask you this. If it were determined that, you know, this typo had caused things to go off the rails in terms of the administrative process, would she be entitled to benefits during the period until it can be finally determined, you know, what is the clean record and what is the record we're going to go from? No, because Dr. Smith said very clearly at the end of saying she can't do what her attorney's describing as being her job, he says, but she can do the job that was given to me in the job description the first time around, and that is the job as described by her actual supervisor of what she actually did as a nurse anesthetist. Except that he says in his letter she would not be able to do her prior job as a nurse anesthetist. But he's referring to the way it was described by the attorney, which is just completely incorrect, because then he goes on to say, but she could do what was in the job description, and that is what her job really was. That's what the chief anesthetist said her job was. No one's ever disputed that that's what her job was. But that's not, but those aren't his exact words. He said she can't do her prior job as a nurse anesthetist, but that the, the capital the, even though it's in the middle, medical records did not document objective findings, pathology or impairments that would preclude her from doing more sedentary nursing duties that fall within the category of her own occupation, such as administrative quality review or utilization review. Well, that own, that's not what a nurse anesthetist does. So how could her own? I agree that's not what a nurse anesthetist does, but it does specifically reference the fact that she could do things within her own occupation. And I think you have to go back to what was her occupation as described by her employer, because as counsel for the appellant said, it's the employer that decides this. So the employer is the one who said this description coming from the chief anesthetist is what her occupation was. That's, you know, when you link it all up together. But the description doesn't match administrative quality review or utilization review. I agree that goes beyond it. I'm not quite sure why they solicited comments from Dr. Smith about things beyond that. But if one determines, as is necessarily the case here, that she could do her own job, her own occupation, as described by her supervisor, then there is no need to go further. You're sort of having a semantic dispute over job versus occupation. I agree. It is a semantic dispute, except for the fact that even in her attorney's letter, the Dictionary of Occupational Title describes the generalized job in the same way and in a way that's consistent with what the job was at Kaiser where she held that job. So it seems to me that what we're talking about here is a little surplusage because for what reason, I don't know, someone asked Dr. Smith to go ahead and comment further on some other types of positions. I don't know what the reason was for asking for that comment. But it doesn't take away from the question. But it's not a Q&A. It's a letter he wrote, right? In the original assignment to him, he was asked to comment on that. It was my recollection. And I don't think I could point the Court to that right off the top of my head out of these 600 pages. And then he goes on and explains why he's saying that even on these much more complete records, she can do the job that was originally described to him as being her occupation. It really is a question of semantics. Do you call that a CRNA job? Or do you call it something else? Does he mistakenly take what the attorney said and call that the CNRA job? Yeah, in fact, he does. That's what's going on here. And if you still have to say that she has to do, she can do her own occupation, if I accept that, then why don't you have to have some evidence of 80 percent, the analysis that you can do 80 percent of that? That's an excellent question, and I would like to respond to it quickly, because that's another place where this whole thing goes off the rails, I think. When she decided she didn't want to work nights anymore, her doctor's records reflect that that was the product of a discussion with him where she said bouncing around on shifts from day to night to weekends to on-call to this to that was just basically messing up her body clock, is what it amounted to, and that she was having sleep problems and she didn't want to do that anymore. That didn't have anything to do with her disabling conditions or what she later said were disabling conditions. That just had to do with the ordinary complaint of any average working person who gets bounced around in their job schedule. So she asked him to do that. But for her, it was exacerbated her condition, did it not? The medical records do not say that. She tried to argue that later, but that's not what the medical records say. The doctor's own notes about it don't bear that out. But what happened was later she tried to basically backdate her alleged onset of disability to October of 2000, six months earlier, so that she could try to take advantage of a higher salary amount and make this argument. But the fact was she just didn't want to work nights. Now, it's not too surprising. She lived a long way from the hospital. She lived up in Feather River, basically, area, and she was working in Sacramento. So that's a good long drive, and especially if you're working nights, I can see why she wouldn't necessarily want to do that. That's probably fairly stressful to commute like that. But the fact is, the reason she went to a shorter shift, a shorter work week, was that she wouldn't work nights anymore. She got her doctors to support that and say it's, you know, it's disorienting to her or whatever. And without working nights, it meant she had fewer hours, because that was the way she was making up the hours that she was getting. So what you have is, by her own choice and for reasons unrelated to the conditions that she says disabled her, she goes to a shorter work week. Now, when she reports that she has become disabled and ultimately submits a claim to MetLife, she doesn't say she became disabled in October of 2000. She says her disability date is March of 2001, and the plan very clearly says, we look at your salary immediately before your disability date. So when you look at the question of how much does she have to make, you don't go back to when she was working nights and had extra shifts. You look at what she was making in March of 2001 and you say, can she make that much? And the answer has to be yes, because she could still do the job according to the findings and according to the way her supervisor described that job. And I see I'm out of time. All right. Thank you. Thank you, Your Honor, for this chance for rebuttal. The policy, and it exerts a record 39, which is from MetLife, says, own occupation means the activity that you regularly perform as determined by the employer. There's no question and no one is denied that as a nurse anesthetist, Liz Schofield had to put people to sleep using anesthesia, monitoring them to keep them alive and wake them up. Is this 100-pound lifting, is that a typo or is that what she would have to do? Well, Your Honor, I believe that she would have to move patients. You have to be able to turn patients over. You have to be able to manipulate them for anesthesia. There's no question that that was not something that was just an extraneous comment that was picked up by Dr. Smith. Instead, it's clear in Dr. Smith's record letter, I should say, at Exerts of Record 2206, that he says, the job description that I reviewed in my July 2002 file review stated that she was required to lift up to 10 pounds. No reference to the lawyer. This is to the supervisor's statement. And this is Dr. Smith's rebuttal to that. He rebuts that. He's rebutting that. He says, This is not consistent with the job of a nurse anesthetist, which would involve pulling, lifting patients, weighing 100 pounds or more, also bagging patients, requiring ventilary assistance, we're back into the mumbling again, ventilary assistance and requires strength over 10 pounds. This is Dr. Smith's description of the nurse anesthetist's job as he knows it. He's not rebutting it. Let me just try to sort it out as a practical matter. Sure. We have supposedly the job description at page 340 of the record, which doesn't have a 100-pound requirement. So do you agree in principle that the own occupation job description is the one that is done by the employer, that that's within the employer's province? I would agree with that, Your Honor, and that the own occupation is nurse anesthetist. Whether it requires 10 pounds or 100 pounds, she still has to have the ability to focus and concentrate and be with her patient 100% of the time to keep them alive after she has put them out with anesthesia and bring them back to life. What does it say, though, at the top of that paper as to how they describe her own occupation? This is, again, excerpts of record R76, employees, job title, CRNA. And then what's most important, and I just ---- I think what we're confusing here is job title is not the same as occupation. Yes, I agree. I mean, you know, you can be a corporate lawyer. Your occupation can be being a lawyer. You can be a corporate lawyer. You can be an appellate lawyer. You can be all kinds of things. And that may be your job title, but that's not necessarily your occupation. I agree with you, Your Honor. And, again, it gets back to the really basic simple question. Nurse anesthetist. What does an anesthetist do? An anesthetist administers anesthesia, monitors the patient, and bring them back and make sure that they stay alive and bring them back to life. And every doctor in the record, every piece of evidence in the record, shows that, unfortunately, by 2001, Ms. Scofield had lost the energy, had lost the focus, had lost the ability to concentrate. Even after taking the 80% of her normal 40-hour week, not working night shifts, she could not keep that focus. That is her own occupation, to be an anesthetist. But Dr. Smith seems to go off on this lifting part. He seems to think she can do the other. In his conclusion, the only reason she couldn't do what was described there was because of the heavy lifting. But you take that away? Doesn't he say she didn't have any problems with concentration and focus? Focus and so forth. Excuse me for speaking over, Your Honor. Actually, Dr. Smith goes on to say at Record 207 exactly what Dr. Heikes and everyone else says, including the supervisor, Ms. Scofield, let's see, also a nurse anesthetist, this is at our excerpts of Record 207, also a nurse anesthetist would require the ability to focus and concentrate. Ms. Scofield would not be able to do her prior job as a nurse anesthetist. And then he, everybody agrees, there's no medical disagreement in this record that Ms. Scofield, because of the combination of all these difficulties, fibromyalgia, chronic fatigue syndrome, the bad back, even after a five-month trial of working only 80%, even after a five-month trial of not working nights, because of the sleep deprivation, because of the lack of focus, she was a danger to her patients. So does this, well, if she was reviewing patient records, she may or may not be a danger given a different stress level. But does it come down to, in the own occupation category, which is defined in the plan as the activity you regularly perform as determined by the employer, does the case ultimately come down to the definition of what own occupation is and whether it is her anesthetist's job or some other job? And is that something that is decided here on appeal, or is that something that we would need a remand? Decided here on appeal, Your Honor. This Court has ruled before that the fiduciary does not get a second bite at the apple. And that was decided as far ago as Lange and Gross-Solomon. The initial denial is either upheld on the internal appeal or reversed on the internal appeal. The initial denial was on the basis that Ms. Schofield could continue to work as a nurse anesthetist. That's why they said and the district court said, therefore we don't have to get to the 80% of salary. It's not 80% of her work, it's 80% of her salary issue. That's the policy definition. That's the trigger. That's what triggers coverage, 80% of your predisability earnings. That's what triggers the coverage. It could be from one disease or 20 diseases. It could be from one problem or a combination of problems. They did not get to that because on their initial determination, this is what the statute requires and the regulations, to set out all the reasons for the denial and have a communication with the beneficiary as to what more is needed. They're supposed to help the beneficiary supply them with what they need. Eventually, Ms. Schofield got them the entire record. The MetLife's April letter, Dr. Smith's April review, reversed and rebutted their own initial determination letter. They affirmatively said, with no qualifications whatsoever, that she could not work as a nurse anesthetist. They don't get a second bite at the apple and then say now she can work as something with a sedentary position. That's not allowed. Okay. I think we have your argument in mind. Yes. I thank both counsel for your arguments this morning. The case of Schofield v. MetLife is now submitted. Thank you. And we're adjourned. Thank you for your patience with my hearing. Absolutely. Thank you.
judges: McKeown, Callahan, Siler